Melissa Crow on behalf of Amicus Curiae American Immigration Council in support of the petitioner in this case as well. Your Honor, the government focuses on one phrase of 8 CFR 287.3C, placed in formal removal proceedings, which we maintain describes which non-citizens arrested without a warrant must receive the advisals, not when such advisals must be provided. Under the regulations, first of all, the regulation requires that a warrantless arrestee be notified of the reasons for arrest, which suggests some proximity between the time of the arrest and the actual notification. However, practically speaking, weeks or months sometimes pass between the time of the arrest and the time that the NTA is filed with the immigration court. In this case, I believe a month passed. Secondly, the 1997 version of the regulation vested the examining officer with responsibility for providing certain advisals. Under the government's interpretation, advisals need not be provided until long after the examining officer's involvement in the case has ended. And finally, Section 287.3C of the regs requires immigration officers to tell warrantless arrestees that their statements may be used against them in a, quote, subsequent proceeding. However, once an NTA has been filed with the court, removal proceedings have been initiated. So the proceedings would by definition be instant rather than subsequent. I would just remind the court that the regulatory history does indicate that the phrase placed in formal proceedings was intended to distinguish between those noncitizens placed in formal proceedings under 238 or 240 who are entitled to the advisals and those who are subject to expedited removal at the border under INA 235 who are not. The government argues further that serving the notice to a peer satisfies the requirements of 8 CFR 287.3C. And in this case, we're advocating the regulation. The requirements for a notice to a peer are codified in INA Section 239. And those requirements include advising the arrestee of the charges of removability, whereas 287.3C requires that the arrestee be advised of reasons for the arrest, which could in many cases be two different things. The second distinction is that nowhere in the requirements for the NTA does it say that any statement made may be used against the individual. Interestingly, following the board's decision in Garcia Flores, I don't know exactly when it happened, the Immigration Service amended the notice to a peer form to say that any statement made may be used in removal proceedings. And I think that this distinction is quite telling, because the NTA refers to removal proceedings, whereas 287.3C says subsequent proceedings, which I think indicates that the different advisals are supposed to happen at different times. It could have meant that, or it could have been done to make clear that they're not thinking of criminal matters. Which advisal could have been intended to make it? Well, I mean, I can see saying your statement may be used in a subsequent proceeding, theoretically might lead them to think it could even be used in a criminal proceeding. But if you change it and say in removal proceedings, then that narrows it to the administrative context. That's true. That's true. But the individual criminal immigration charges could also be addressed during immigration proceedings as well. For example, something like unlawful entry is a type of immigration violation with criminal undertones. But point well taken. Finally, I would just note that 8 CFR 287.3C is in the section of the regulations governing DHS, not governing what happens in immigration court proceedings, which further reinforces the conclusion that the advisals must be provided at a point in the proceedings when DHS is involved. And finally, I'd like to, actually two things finally. Does that limit it to the border situation? Or where would DHS be involved? No. 287.3C applies to warrantless arrests, which could happen in a whole myriad of situations at the border, in home raids. It governs DHS, Department of Homeland Security. Right. But ICE officers are involved in warrantless arrests at work sites, in the interior, in the context of roving patrols, as are CBP officers, or in the context of home raids as well. So no, it's not limited to border scenarios, which is why this case has such significant repercussions. Judge Wardlaw, you asked a question about the form that states, that uses the term administrative proceedings in its title, going back to 287.8C24, which makes a reference to administratively charged. And I believe, again, there that the language, the distinguishing language is significant. That form does not say charged. It refers to some sort of administrative proceedings. And so I think that's relevant, and I think it bolsters the point that the advisals must be given prior to custodial interrogation. Finally, just a quick word about 287.12. I think that the regulatory history here is quite telling. 287.12 was not promulgated until 1995, whereas the advisals in 287.3 were promulgated almost 30 years earlier, in 1967. And when 287.12 was posted in the Federal Register, there was concern expressed by some commenters that it would preclude victims of unlawful enforcement action from pursuing remedies for regulatory violations. While 287.12 did not provide independent grounds for relief in a civil or criminal proceeding, it didn't prevent a party from pursuing existing relief under Federal law. And I believe in that regard that the use of the term create in 287.12 is significant. In terms of the already existing remedies and rights, I would draw Your Honor's attention to the Supreme Court's decision in Icardi, which held that DHS cannot sidestep adherence to its own regulations, especially when an individual's procedural rights are affected. And based on Icardi, both the Ninth Circuit and the Board have terminated removal proceedings based on regulatory violations. In Calderon, Medina, this Court found that a regulatory violation can lead to termination where the regulation serves the purpose of benefit to the alien and where it causes prejudice to the interest protected by the regulation. However, prejudice can be presumed where the regulation protects a constitutional right or where it violates a procedural framework that's intended to ensure fair processing. And I would argue that both of those situations are present in this case. I would like to back to a second for the administratively charged. You would say administratively charged when they notice to appear as served, is that right? That is the government's interpretation. We did extensive research to try to find a reference to this term in the regulations and in case law, and we found nothing. Yeah. It hasn't been construed as far as I know. No. We couldn't find anything. And whatever it means, I think, is somewhat irrelevant, because we would argue that the language of 287.3 is plain. Well, the thing is, if you're relying on that regulation, it seems to require the advice that when someone's administratively charged, and whenever that occurs, I would think it would have to be after they have elicited some information from the, you know, the RASD head. Again, given the structure of 287.8C24, I think that that term, administratively charged, refers to who must get the advisals, not when, in the same way that placed informal proceedings does in 287.3C. Thank you, Your Honors. My name is Douglas Nelson. On behalf of the Petitioner, there's one more point that I would like to raise about the Sana'a case, and it deals with the who bears the initial burden of proof in these proceedings. Because it appears as if that court that decided Sana'a may have made a mistake. If you look at footnote six, it cites the Trias-Hernandez case, and in quotes says, in light of the alien's burden of proof, the requirement that the alien answer non-incriminating questions, the potential adverse consequences to the alien of remaining silent, and the fact that an alien statement is admissible in the deportation hearing, despite his lack of counsel at the preliminary interrogation, Miranda warnings, would be not only inappropriate, but could also serve to mislead the alien. Now, that's a long quote, but let me focus on why it's important. It starts with the words, in light of the alien's burden of proof, as if it's the alien who bears the initial burden. The alien does not bear the initial burden of proof, and that's important when we examine the advisals for 287. Yes? Now, the government always bears the burden of proof if it suspects that a person is in the United States unlawfully, and that's by regulation. And the government also always bears the burden of proof when a returning lawful permanent resident is seeking admission to the United States. So in those circumstances, it's always the government's burden of proof. Now, if the Samayoa court believed that it was the alien's initial burden of proof, then that means that the alien must come forward voluntarily with information to prove either alienage or admissibility or lawful status in the United States. But when it's the government's burden, they have to come forward with that evidence or proof first. And when it's the government's burden, in a custodial interrogation by an officer, I can't think of a circumstance where the government doesn't tell them that the statements they make can be used in subsequent proceedings. Okay? So when you examine it in this context, it's very important, and there's a potential clear regulatory violation, but possible due process problem. You see, because, again, I can't think of an instance of an individual who has been given a custodial interrogation by an officer where the person isn't first told that their statements could be used in subsequent proceedings. And the timing of when those statements, the timing of when that advisal must be given is of utmost importance, okay, upon custodial interrogation. So that's the last point I wanted to raise about Samayoa. I'm ready to go forward with arguments regarding the asylum unless you have other questions about Samayoa or 287.3C. I will continue then. My client is also arguing that the government, the judge, failed to grant the response to the asylum when he clearly suffered past persecution and was entitled to a humanitarian grant of asylum. Here we have a gentleman whose father was assassinated by the government because he protested the government's corruption. Then his mother was killed in 1988 by a guerrilla group, and the death of his mother happened after the petitioner had been threatened for six years by this guerrilla group. They had repeatedly sent him threatening notes, and he said that he feared harm. And he feared so much harm that he abandoned his career in the military, and he also fled his mother's home. And just a few months later after he fled his mother's home is when she was attacked, bludgeoned over the head, and the home was burned. Those aren't the only persons in his family who were threatened or harmed. His brother, who later became an ex-member of this guerrilla group, was abandoned and abandoned. His brother, Luis, who was picking up and cleaning up the home after it had been burned, was also repeatedly threatened. Now, under the Mashiri case, which I've cited in my brief, these threats combined with harm to family is sufficient to satisfy the past persecution threshold. And there are a few... As I recall it, the IGA said even if this was persecution as a matter of discretion, I would not grant humanitarian relief. But wasn't there a statement something like that in there? And can we review it if there is? Yes, you can, and for this reason. Because up until that point, the immigration judge had made a mistake in assuming or deciding that there was not past persecution. He failed to see the nexus, and he failed to see that the past persecution was sufficient in order to qualify. And then he turned to the discretionary decision. And so there wasn't a rational basis for him to deny indiscretion, and all the facts before that, in our opinion, did show past persecution. So if we agreed with you, we would have to send it back and say, you're wrong. This was persecution. Now think again. Examine it both under whether the person had suffered, whether that past persecution still qualified the person for asylum today, and under the humanitarian grant of asylum, which is discretionary. So yes, it would be for those two reasons. And if it came to that, maybe discuss well-founded fear if you got into the future. Exactly. Correct, Your Honor. And so I have about four minutes left. I'd like to reserve those for rebuttal if there are no further questions at this time. Thank you. Lindsay Murphy again, Your Honors, on behalf of the Attorney General. Going back briefly to Petitioner's comments and Mikas' comments regarding Samayoa, I would like to point out that Petitioner, in this case, Miranda Fuentes, did bear the burden of establishing that he was admissible to the United States. Although he was a returning lawful permanent resident, because he was suspected of alien smuggling, under 1101A3C, I believe, Miranda became classified as an arriving alien, and accordingly, it was his burden to establish that he was admissible to the United States. Classified as a what alien? An arriving alien, Your Honor. Arriving alien. Yes. Additionally, in this context, Miranda warnings, this Court has recognized, are not appropriate in the context of aliens who are seeking admission to the United States. Why was he an arriving alien? I thought he was an LPR. He was an LPR, but because he was caught at the border trying to, or suspected of alien smuggling and referred to secondary inspection, he was arguably engaged in a violation of the law and became inadmissible under 1182A2. But that wasn't proven at that point. How do you strip him of his rights at that point? This Court has previously held that the immigration officers do not have to prove conclusively that he had engaged in alien smuggling at that point. In fact, it's nearly impossible to without questioning and doing further investigation. But it is sufficient at that point to treat Miranda and petitioners like him as arriving aliens. What case do you have on that? I don't have the case in front of me, Your Honor, but I will be happy to follow up with a 28-J letter. Right. Never heard of that. In addition, Your Honor, this Court has held previously that Miranda warnings would be inappropriate in the context of an alien who is seeking admission to the United States. Miranda warnings would serve to... Well, suppose he didn't have the, he was an alien smuggling. He wouldn't be classified as a person seeking admission. Right. He'd be classified as a returning LPR. Okay. And so for aliens who are seeking admission, reading them Miranda rights would serve to mislead them by telling... Because they bear the burden of establishing that they're admissible, if they're to be advised that they don't have to make any statements, that the statements can be used against them, it would mislead them and arguably act against their interests because they wouldn't be able to establish that they're admissible. Furthermore, requiring advisals to be read by the immigration officers at the border would really cause the border processes to grind to a halt. Immigration officers need to be, at these busy border checkpoints, they need to be able to question aliens to determine whether or not they're admissible, to determine whether or not their status as United States citizens, if they're aliens who are presenting themselves for admission or non-LPRs. And as a result, if, Your Honors, if the immigration officers do not have the leeway of at least establishing whether aliens are arriving aliens, whether or not they're engaging in illegal activities that would make an LPR an arriving alien, then the entire process would be slowed considerably. Well, I can understand when a car first drives up and is the first contact at the border, the officer is going to make some questions. He's going to say, you know, who are you, make sure, are you citizens and so on, and they can say yes or no. I don't know that anybody would say that you have to give advice before then, but if you get an answer that makes, that seems suspicious and send somebody to secondary inspection, I mean, isn't there some point at which you're beginning to target somebody and that advice might be appropriate? Yes, and, Your Honor, and the agency has determined through the regulations that that advice is not appropriate until the filing of the NTA. However, for practical purposes, those advisers are given with the service of the NTA upon the alien, which is... Well, it really makes no sense at all to say that you don't have to give that advice until the NTA is filed. I mean, it just makes it useless. What earthly purpose does the advice serve if you've already asked all the questions? Well, the advice serves to advise aliens of their rights in removal proceedings and any point between being served with the notice to appear when they receive those advisals and the start of removal proceedings so that they don't make any further incriminatory statements. Well, I suppose they might make further statements. I don't know. It's hard to see. I know Samoyo is in the way, but it's hard to see the sense of advice that occurs after the interrogation. I think it's completely illogical. I'm just trying to figure out how to distinguish Samoyo. I think Samoyo is pretty definitive that the advice... Yeah, Samoyo is pretty wrong. So it's completely illogical. You warn someone after the point where they've already talked. Does that make sense to you? I know. You're just doing your job. It's okay. I don't want to attack you. If the court has no further questions on the regulatory issue, I'll move on to the issue of asylum. The board here properly concluded that there's... Actually, there's no reason to disturb the board's determination denying Miranda asylum and withholding of removal because the record does not compel the conclusion that he was targeted on account of a protected ground. He's found credible, I believe. Yes, Your Honor. And it seems to me an awful lot of the comments of the IJ and the BIA are that... Well, the real reason was that he wouldn't disclose where the arms were or something like that. But it doesn't have to be the only... The forbidden persecution doesn't have to be the only purpose of harassment or persecution. Isn't there enough evidence here to say, well, at least one of the purposes was...? The record, and as the board concluded from the record evidence, the record doesn't compel the conclusion that he was targeted for any reason other than the fact that he stopped providing help to this guerrilla group. And it's a very high standard that the petitioner must overcome. And really the facts don't bear out that the petitioner was targeted on account of his race, religion, nationality, membership in a particular social group or political opinion. And nothing in the record that the petitioner has pointed to compels a contrary conclusion. And because the petitioner failed to establish past persecution, he is not entitled to humanitarian asylum. For these reasons, the court need not disturb the board's decision. You're just helping out the government instead of helping the poor people and things like that? We just ignore that or what? Well, unfortunately for the petitioner, and the board did recognize that these were tragic events that occurred in his life with the death of his father and the death of his mother, but unfortunately the way the law is written, the law does not provide any relief for the petitioner. He has to wait to apply until he gets killed. Well, the petitioner hasn't established that. I mean, the agency didn't reach the issue of future persecution, a well-founded fear of future persecution. But in the record, the petitioner doesn't make reference to any fears of future persecution or any threats that he has suffered after leaving Guatemala in the late 1980s. When did he leave? I believe he left in 1989. And then he came back briefly in 2004, I think. Yes, Your Honor. Okay, and if the panel has no further questions? Has there been any discussion of mediation? I don't believe, and I don't have in the record any request from the petitioner for any sort of prosecutorial discretion or anything that would require mediation in this case. Did it ever occur to the government that a case would be a good one for mediation? It would be a consideration, Your Honor. But I think absent requests from the petitioner, it's not usually the government's practice. Thank you. Thank you, Your Honors. Just a few more points, thank you, Your Honors. Again, this is Douglas Nelson on behalf of the petitioner. First, I want to make clear that we are not arguing for advisers for everyone who crosses the border, just those who are subject to warrantless arrest. And that's the purpose of the regulation. Second, remember that after the NTA is served, the government almost never, and I am unaware of any circumstance, where they continue to investigate the person, okay, because by then they've already gathered all the evidence that they believe is necessary to prove the grounds of inadmissibility or deportability. Third, in the case of a returning lawful permanent resident, the burden is clearly on the government to investigate the person. The burden, they have that initial burden. What's the initial burden of showing what? That they believe he's committed an act which makes him inadmissible or removable. And there's a lot of case law on this, and I can cite Landon v. Plasencia, the Board case of Matter of Sosa, Matter of Rivens, R-I-V-E-N-S, where the government bore the burden in that case involving an alien who allegedly committed a crime of rendering him inadmissible. And they bear that burden at the removal proceeding? Yes. In fact, that happened in this case where the respondent said, we are going to leave it to the court to decide whether the government had met its burden to show removability. The examining officer can't arbitrarily say, oh, well, you're bringing in, you're attempting to alien smuggle, so therefore you're an arriving alien, we're going to treat you that way, you have no rights. Exactly. They have to have some proof of that. That's their burden. And regarding the asylum claim, just one. You mentioned and you acknowledged that my client did return to Guatemala for a very short period, for just a couple of weeks, and that's correct. And I don't think that should undermine his claim for this very important reason. We are arguing that he suffered terribly in that country. And I would analogize it to a child who has suffered abuse in a home. Now, the child can grow up and leave that home, and on occasion even visit that home. But to make that person live in those environs with the same wallpaper and furniture and carpet would be cruel. So what the government is asking is that this petitioner return to the environs where he suffered repeated threats, lost his father, lost his mother, and was threatened with death. And we have to examine also the context of what was happening then. This was during the civil war, okay, between the guerrillas and the Guatemalan government. And nearly everything can become political in such tiny times. If we found any substantial evidence compels the contrary conclusion to the BIA and we remand it, would the government be able to bring in current country conditions to show changed conditions under the well-founded VR prong? Yes, they're allowed to do that, but once the petitioner establishes past persecution, that burden is shifted to the government, first of all, which is very important. And second, he still remains eligible for a humanitarian grant of asylum because compelling circumstances show that it would be cruel to return him to his country. Thank you. Anything further? Thank you. Thank you all.
judges: Canby, Reinhardt, Wardlaw